IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| MAX LAURENT KANAHELE,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>ANDREW SAUL, Commissioner of Social Security,<br><br>　　　　Defendant. | Case No. 20-cv-00292-DKW-WRP<br><br>**ORDER AFFIRMING DECISION OF COMMISSIONER OF SOCIAL SECURITY** |

　　　　Plaintiff Max Laurent Kanahele appeals the decision of the Commissioner of Social Security, denying him disability insurance benefits for the period from January 1, 2015 through December 31, 2015, asserting that the Administrative Law Judge (ALJ): (1) improperly rejected the 2019 medical opinions of Dr. David Stein and Dr. Jeanne Hogan, and (2) made an improper credibility assessment of Kanahele's symptom testimony.　After careful review of the record and the parties' arguments, the Court disagrees.　First, the ALJ did not improperly reject either Dr. Stein or Dr. Hogan's 2019 opinions, not the least because the ALJ relied upon a different opinion from Dr. Hogan in 2017−an opinion that was most closely supported by the pertinent treatment records.　Second, the ALJ properly relied upon treatment notes from the relevant time period in assessing Kanahele's

symptom testimony−notes that provide no support for the testimony given. Therefore, as more fully set forth below, the Court AFFIRMS the decision of the Commissioner in this case.

## BACKGROUND

I. **Review of Disability Claims**

A five-step process exists for evaluating whether a person is disabled under the Social Security Act (SSA). 20 C.F.R. § 404.1520. First, the claimant must demonstrate that he is not currently involved in any substantial, gainful activity. *Id*. §§ 404.1520(a)(4)(i), (b). Second, the claimant must show a medically severe impairment or combination of impairments that significantly limit his physical or mental ability to do basic work activities. *Id*. §§ 404.1520(a)(4)(ii), (c). Third, if the impairment matches or is equivalent to an established listing under the governing regulations, the claimant is judged conclusively disabled. *Id*. §§ 404.1520(a)(4)(iii), (d).

If the claimant's impairment does not match or is not equivalent to an established listing, the Commissioner makes a finding about the claimant's residual functional capacity (RFC) to perform work. *Id*. § 404.1520(e). The evaluation then proceeds to a fourth step, which requires the claimant to show his impairment, in light of his RFC, prevents him from performing work he performed in the past.

*Id*. §§ 404.1520(a)(4)(iv), (e), (f).   If the claimant is able to perform his previous work, he is not disabled.   *Id*. § 404.1520(f).   If the claimant cannot perform his past work, though, the evaluation proceeds to a fifth step.   *Id*. § 404.1520(a)(v), (g).   At this final step, the Commissioner must demonstrate that (1) based upon the claimant's RFC, age, education, and work experience, the claimant can perform other work, and (2) such work is available in significant numbers in the national economy.   *Id*. § 404.1560(c); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (explaining that, at step five, the burden moves to the Commissioner).   If the Commissioner fails to meet this burden, the claimant is deemed disabled.   20 C.F.R. § 404.1520(g)(1).

## II.   The ALJ's Decision

On April 17, 2019, the ALJ issued a decision finding Kanahele "not under a disability" for purposes of the SSA from the alleged onset date of January 1, 2015 through December 31, 2015, which is the date Kanahele was last insured. Administrative Record ("AR") at 26.   At Step One of the evaluation process, the ALJ determined that Kanahele had not engaged in substantial gainful activity from January 1, 2015 through December 31, 2015.   *Id*. at 28.   At Step Two, the ALJ determined that, through December 31, 2015, Kanahele had the following severe impairments: degenerative disc disease of the lumbar spine; obesity; and bipolar I

disorder. *Id*. At Step Three, the ALJ determined that, through December 31, 2015, Kanahele did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the governing regulations. *Id*. at 29.

Before reaching Step Four, the ALJ determined that, through December 31, 2015, Kanahele had the RFC to perform "light" work, except that he:

> could lift and carry 20 pounds occasionally and 10 pounds frequently; could stand and walk 6 hours in a[n] 8 hour period; could sit 6 hours in an 8 hour period; occasional use of stairs; never ladders, ropes or scaffolds; occasional balancing; occasional stooping; no kneeling; occasional crouching; no crawling; avoid concentrated exposure to hazardous machinery and unprotected heights; simple routine, repetitive tasks; occasional changes in the work setting; rule out production rate paced work, meaning assembly line work such that another employee's performance is dependent on the immediate prior performance of the claimant; occasional interaction with the public; and frequent interaction with co-workers and supervisors.

*Id*. at 30.

At Step Four, the ALJ determined that, through December 31, 2015, Kanahele was unable to perform any past relevant work. *Id*. at 33. At Step Five, the ALJ determined that, through December 31, 2015, there were jobs that existed in significant numbers in the national economy that Kanahele could perform. *Id*. More specifically, a vocational expert stated that, in light of Kanahele's RFC, age, education, and work experience, he would be able to perform the jobs of routing

clerk, photocopy machine operator, and router. *Id*. at 34. This final determination resulted in the ALJ finding that Kanahele was not disabled for purposes of the SSA at any time from January 1, 2015 through December 31, 2015. *Id*.

### III. The Appeals Council's Decision

On May 8, 2020, the Appeals Council denied Kanahele's request for review of the ALJ's decision, making that decision the final decision of the Commissioner. *Id*. at 1.

### IV. This Action

In his Opening Brief, Dkt. No. 21, Kanahele makes two principal arguments. First, the ALJ improperly rejected the medical opinions of Dr. Stein and Dr. Hogan. Second, the ALJ made an improper credibility assessment of Kanahele's symptom testimony.[1] Each is addressed below.

## STANDARD OF REVIEW

A court must uphold an ALJ's decision "unless it is based on legal error or is not supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d

---

[1] Kanahele appears to make these arguments both in the context of the RFC determination and the determination that a sufficient number of jobs existed in the national economy at Step Five. *See* Dkt. No. 21 at 5-6. In whatever context the arguments are intended, the Court does not construe them any differently, *i.e.*, herein, the Court simply reviews whether the ALJ erred in the manners argued by Kanahele.

1194, 1198 (9th Cir. 2008). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Id*. (quotation omitted). Stated differently, "[s]ubstantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (quotation omitted). "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Id*. at 679; *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014) ("[Courts] leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record.").

In addition, a court may not reverse an ALJ's decision on account of an error that is harmless. *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (quotation and citation omitted). In making this assessment, a court "look[s] at the record as a whole to determine whether the error alters the outcome of the case." *Id*. at 1115.

## DISCUSSION

I.  **Opinion Evidence**

Kanahele argues that the ALJ improperly rejected the opinions of Dr. Stein and Dr. Hogan.  Dkt. No. 21 at 12-20; Dkt. No. 23 at 1-7.  With respect to Dr. Stein, Kanahele offers that the ALJ should have given great weight to his opinions and erred in rejecting the same based solely upon some of the doctor's treatment notes−notes that Kanahele argues show he was "seriously struggling with his mental health."  Dkt. No. 21 at 17.  As for Dr. Hogan, Kanahele acknowledges that, in 2017, the doctor opined that he was capable of coping with a low-demand job, but argues that the doctor's opinion in 2019−that he would have extreme difficulty in completing a normal workday−should not have been rejected.  *Id*. at 19-20.  Kanahele argues that the 2019 opinion was rejected on the same "inadequate" grounds as Dr. Stein's opinion, and Dr. Hogan's 2017 opinions merely reflected his condition "at the moment in time" they were made.  *Id*. at 19.

The Court disagrees with Kanahele's assertions.  As an initial matter, one of Plaintiff's principal arguments faults the ALJ for using the same reason to reject both Dr. Stein's opinions and Dr. Hogan's 2019 opinion−that those opinions were not supported by treatment notes from 2015.  There is a very good reason, however, why the ALJ relied upon those treatment notes: they are the *only* medical

evidence in the record from the relevant time period of 2015. *All* of the other medical evidence in the record, including Dr. Stein and Dr. Hogan's opinions, pertains to time periods outside of 2015. Thus, it is hardly surprising that the ALJ would fall back, repeatedly, on the only evidence from the relevant time period. This was not error.

As for the treatment notes, as the ALJ determined, they do not support, in any way, the extreme limitations to which Dr. Stein and Dr. Hogan in 2019 opined. Rather, as the ALJ also determined, the notes most closely support the opinions expressed by Dr. Hogan in 2017 that Kanahele could, among other things, cope with a low-demand job.[2] More specifically, Dr. Stein's notes from 2015, in totality, reflect as follows. In January 2015, Kanahele expressed that it had "been a good year so far[,]" school was starting in a week, his mood was "even[,]" and he had a "hard time" going to sleep. AR at 251. In February 2015, Kanahele was "really anxious" about school, he was "more depressed than manic[,]" and he was sleeping "fine." *Id*. In March 2015, Kanahele had "much anxiety[,]" he was not doing well at school, his ex-girlfriend was engaged, he was going to look for part-time work, his Buspar medication was not working, he was having "racing

---

[2]It is, thus, irrelevant whether Dr. Hogan's 2017 opinion, much like her 2019 opinion, represents an assessment "at the moment in time" it was made, as Kanahele speculates. The 2017 opinion is still the one most closely aligned to the only medical evidence in the record from 2015.

thoughts all day long[,]" his sleep was "ok" until he ran out of medication, he felt depressed, and his body felt "broken." *Id*. at 250. After this visit, Dr. Stein replaced Kanahele's Buspar medication with Xanax. *Id*.

In April 2015, Kanahele reported that he was doing better, he was calmer, and he had gotten his "job back." *Id*. At the first of two visits in May 2015, Kanahele reported that his sleep was okay, he was feeling a "little depressed[,]" he might have gone "manic for a while" as he had been spending a lot of money, and he would like to be more stable. *Id*. at 249. Four weeks later, Kanahele reported that he was working again on the weekends and for special events, he felt "good[,]" he was not depressed or manic, he was anxious about a new school semester, he was sleeping well, and Xanax seemed to be helping him "a lot." In June 2015, Kanahele was doing "good[,]" he was not stressed, and was sleeping "fine." In July 2015, Kanahele reported that he was "good[,]" he was trying to transfer to a different university, there were no side effects from his medication, he was sleeping well, and he was "relatively stable." *Id*.

In August 2015, Kanahele was "ok[,]" but "tired[,]" he was "down, but not too down," and he was stressed about losing health insurance. *Id*. at 248. In September 2015, Kanahele felt stable, he was sleeping okay, his mind was not "racing[,]" and his "only stress" was dealing with family. In October 2015,

9

Kanahele was still doing "ok[,]" he was tired, but he was "not manic or super depressed." In November 2015, Kanahele reported that he was "too tired to feel depressed or manic[,]" but his medications were "ok for now." *Id*. In his final 2015 visit with Dr. Stein, in December, Kanahele reported that he was "ok[,]" nothing was wrong, his mood was stable, he was sleeping well, and he was having no side effects from his medication. *Id*. at 247.

These treatment notes do not demonstrate, or even closely suggest, that Kanahele suffered from extreme work limitations in 2015. Instead, at most, they reflect that Kanahele suffered from anxieties related to school, friends, and family, and he often felt tired. Such issues do not place him outside of the experience of any other worker. In addition, while the notes reflect that Kanahele reported numerous troubling conditions during a visit in March 2015, both prior to that visit, and after the visit when Dr. Stein began to prescribe Xanax, Kanahele largely reported that he was "good" or "ok[,]" he was stable, and there were no side effects from the medication. In addition, the notes reflect that, during 2015, Kanahele was either attending school, trying to transfer to a different school, or even working part-time.

In this light, the mental condition of Kanahele reflected in the 2015 treatment notes most closely support the opinion of Dr. Hogan in 2017. More

specifically, in her 2017 report, Dr. Hogan opined that Kanahele was capable of understanding and remembering simple work instructions, capable of maintaining regular job attendance, capable of simple, repetitive work tasks under ordinary supervision, capable of getting along with supervisors if contact was minimal, and capable of coping with a low-demand job.  AR at 296-297.  Such opinions are supported by the 2015 treatment notes showing that, largely, during that year, Kanahele was doing "good or "ok[,]" he was stable, there were no side-effects from his new medication, and his principal stressors concerned school, family, and friends.

In contrast, the 2019 reports from Dr. Stein and Dr. Hogan suffer from no evidentiary support.  More specifically, in March 2019, Dr. Stein opined that Kanahele suffered from extreme limitations in understanding simple instructions, maintaining concentration for two hours, maintaining regular attendance, working in coordination with others without being distracted, completing a normal workday without unreasonable rest periods, and responding well to changes in the work setting.  AR at 395-396, 398.  Dr. Stein also opined that Kanahele would be unable to attend work for more than 3 days per month.  *Id*. at 397.  As for Dr. Hogan, also in March 2019, she opined Kanahele suffered from extreme or marked limitations in understanding detailed instructions, maintaining concentration for

11

two hours, maintaining regular attendance, working in coordination with others without being distracted, completing a normal workday without unreasonable rest periods, and responding well to changes in the work setting.  *Id*. at 399-400, 402.

There is no evidence in the record that Kanahele suffered from any of these limitations in 2015.  As discussed, the only evidence in the record reflects that Kanahele suffered from no disabling limitations in the relevant time period. While, in his 2019 report, Dr. Stein checked a "Yes" box indicating that the doctor believed Kanahele's limitations existed from at least January 2015, Dr. Stein provides no explanation for this assessment or citation to any evidence.  Dr. Stein also fails to acknowledge that his 2019 conclusions cannot be reconciled with his own 2015 treatment notes.  For example, in his 2019 report, Dr. Stein stated that Kanahele has "very significant impact[s]" from his medications.  AR at 397. That, however, is simply contradicted by the 2015 treatment notes showing Kanahele was not suffering from side effects at that time.

In summary, on one hand, the ALJ had the 2017 opinion of Dr. Hogan indicating that Kanahele could cope with a low-demand job and supporting evidence in the form of the 2015 treatment notes.  On the other hand, the ALJ had the 2019 opinions of Dr. Stein and Dr. Hogan indicating extreme or marked work limitations and no supporting evidence.  The ALJ did not err in relying upon

and/or giving more weight to the former rather than the latter. *See* 20 C.F.R. § 404.1527(c)(4) (providing that more weight will be given to a medical opinion that is "more consistent" with the record as a whole). In addition, contrary to Kanahele's arguments, the ALJ, thus, also did not err in failing to explicitly discuss other factors that can be taken into consideration when weighing medical opinions. *See* Dkt. No. 23 at 6-7. This is particularly so here where, if anything, Dr. Hogan's examining and treatment relationship with Kanahele is, at least, equal to, if not greater than, that of Dr. Stein. *Compare* AR at 247-251 (reflecting 13 visits with Dr. Stein in 2015), *with* AR 607-628 (reflecting 21 visits with Dr. Hogan in 2015).[3]

## II. <u>Symptom Testimony</u>

Kanahele argues that the ALJ erred in considering his symptom testimony by providing "little−if any−analysis" and ignoring statements in Dr. Stein's 2015

---

[3] While not cited to by either party in this proceeding, the Court notes that the treatment notes from Dr. Hogan in 2015 provide a far more detailed view of Kanahele's mental state at that time. AR at 607-628. Having reviewed those notes, they too do not provide any support for the contention that Kanahele suffered from disabling work limitations in 2015. Instead, similar to Dr. Stein's 2015 treatment notes, but in a more detailed manner, they too show that Kanahele's principal stressors were family and relationship issues. Nowhere in the notes does Kanahele express an inability to work due to his mental issues. Instead, in a visit on June 5, 2015, Kanahele stated that he had "[q]uit" his job as a bartender because he was "angered" at not being scheduled on the first Friday. *Id*. at 617. He also stated that he did not want work to interfere with going to school full-time in the fall. *Id*. The Court notes the foregoing, but reaches its findings herein independently of the 2015 treatment notes from Dr. Hogan.

treatment notes supporting his testimony. Dkt. No. 21 at 22-26; Dkt. No. 23 at 9-11.

The Court disagrees. First, the ALJ relied upon, and did not ignore, Dr. Stein's 2015 treatment notes in determining that Kanahele's symptom testimony did not warrant greater limitations to the RFC. *See* AR at 31. Second, as discussed above, those treatment notes do not come close to supporting the extreme limitations to which Kanahele testified. For example, Kanahele argues that the ALJ failed to address his testimony that he had days where he was not able to leave the house due to depression and needed help grocery shopping and driving due to anxiety. Despite the gravity of those alleged issues, though, there is simply no suggestion in the 2015 treatment notes that they existed in 2015. Rather, as discussed, the treatment notes reflect that Kanahele was able to work part-time, go to school, and visit friends, none of which he reported doing while being unable to drive or leave the house.

Kanahele also argues that the ALJ failed to give "proper" consideration to the side-effects of his medication. However, this misconstrues the ALJ's decision. As discussed above, there were no stated side-effects to the medication Kanahele received in 2015, with Kanahele himself reporting no side effects or no new issues. The ALJ, thus, did not err in considering Kanahele's testimony or by failing to do

14

more, as Kanahele argues. Here, the ALJ identified Kanahele's testimony and stated why that testimony did not support greater limitations in the RFC−because the testimony was unsupported by the 2015 treatment notes. *See* AR at 31. That reason applied across Kanahele's testimony, and, thus, the ALJ did not err by failing to repeat it for each alleged limitation. It also constituted a specific, clear, and convincing reason for rejecting the testimony identified in the decision. *See Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (explaining that "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."); *see also* 20 C.F.R. § 404.1529(c)(3) (providing that an ALJ may consider any information submitted in evaluating symptom testimony). Here, the ALJ considered the only relevant information submitted−the 2015 treatment notes−and properly found that the notes did not support Kanahele's symptom testimony. Nothing more was required, and the ALJ did not err.

## CONCLUSION

For the reasons set forth herein, the Commissioner's decision denying Kanahele's application for disability insurance benefits is AFFIRMED. The Clerk of Court is directed to enter judgment in favor of the Commissioner and then close this case.

IT IS SO ORDERED.

DATED: August 12, 2021 at Honolulu, Hawaiʻi.

Derrick K. Watson
United States District Judge